UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| STARBUCKS CORPORATION d/b/a STARBUCKS COFFEE COMPANY, | ) CASE NO. CV 14-01383 MMM (MRWx) |
| | ) |
| Plaintiff, | ) |
| | ) FINDINGS OF FACT AND |
| vs. | ) CONCLUSIONS OF LAW SUPPORTING |
| | ) ENTRY OF PRELIMINARY |
| HOWARD HELLER, SPECIALTY | ) INJUNCTION |
| COFFEES INTERNATIONAL, LLC, | ) |
| CAFÉ NU INTERNATIONAL, INC., | ) |
| | ) |
| Defendants. | ) |
| | ) |

Starbucks filed this action on August 28, 2014, alleging claims for trademark infringement, trademark dilution, unfair competition, false designation of origin, false description and representation, trademark counterfeiting, copyright infringement and violations of integrity of copyright management information.   On September 3, 2014, Starbucks filed a motion for preliminary injunction.  Defendants failed to answer the complaint and their defaults were entered on October 28, 2014.  Defendants also failed to oppose the motion for preliminary injunction. This order constitutes the court's findings of fact and conclusions of law concerning the motion.


**FINDINGS OF FACT**

**A.    The Parties**

1.  Starbucks Corporation is a Washington corporation with its principal place in Seattle, Washington.  Since 1971, it, or its predecessor in interest, has continuously conducted business

under the trade names "Starbucks," "Starbucks Coffee Company," and "Starbucks Coffee." Starbucks Corporation is the owner of multiple federally registered trademarks promoting and protecting the Starbucks brand.

2. Howard Heller is a California resident, who was served with process at 880 West 1st St., Apt. 606W, Los Angeles, California 90012. Heller is apparently the manager, founder, and proprietor of Specialty Coffees International, LLC and/or Café Nu International, Inc.

3. Specialty Coffees International, LLC ("Specialty Coffees") is a Nevada limited liability company. Café Nu International, Inc. ("Café Nu") is a Nevada domestic corporation.

**B.   Starbucks**

4. Starbucks is a leading purveyor of fine Arabica coffee. The company, which began in 1971 as a single, Seattle-based dry goods store, has grown to approximately 12,000 retail locations in the United States, and more than 8,000 retail locations in over 60 foreign countries.[1]

5. Starbucks owes its worldwide success to its strong reputation for fresh-roasted specialty coffees, brewed coffees, espresso beverages and other products and services it provides. Starbucks is also widely recognized for its knowledgeable staff and superior service.[2]

6. Starbucks is the owner of numerous, valid, and incontestable United States trademark registrations comprised of or incorporating iterations of the "Starbucks" and "Starbucks Coffee" names, the Siren Logo, and Cup Designs (the "Starbucks Marks"). These have been registered in more than 180 countries.[3]

7. Starbucks has registered the original artistic work on its logos with the United States

---

[1]   Dkt. No. 17 at 2; Dkt. No. 17-1, Warmke Decl., ¶ 2.
[2]   Dkt. No. 17 at 2; Dkt. No. 17-1, Warmke Decl., ¶ 2.
[3]   The Starbucks Marks include, but are not limited to, Registration Nos. 1,374,630; 2,086,615, 2,189,460; 2,236,553; 2,027,528; 3,330,858; 1,444,549; 1,452,359; 2,073,104; 1,815,938; 1,891,561; 2,176,976; 2,176,977; 2,180,757; 2,325,182; 2,696,594; 3,175,941; 3,330,858; 3,699,649; 4,429,111; 2,039,849; 1,542,775; 1,815,938; 1,815,937; 3,298,945; 3,673,335; 1,943,361; 3,428,127; 2,120,653; 2,266,351; 2,266,352; 1,893,602; 2,428,128; 3,428,128; 4,415,862; 4,538,053; 4,572,688; 3,175,941; 3,070,042; as well as U.S. Trademark application nos. 85/244,517; 85/792,872; and 86/178,130. (Jacobs Decl., ¶¶ 4-16; Complaint, App. A).

Copyright Office.[4]

8.  These registrations recognize the exclusive rights held by Starbucks in the Starbucks Marks and Copyrights.

9.  Each Starbucks store prominently displays the Starbucks Marks and Copyrights.[5]

10.  Starbucks serves coffee and other beverages through hundreds of authorized accounts and via its store.starbucks.com website. These channels prominently display the Starbucks Marks.[6]

11.  The Starbucks Facebook page has more than 37 million likes and more than 20 million visits.  The Starbucks Twitter account has more than 6 million followers.  Both platforms prominently feature the Starbucks Marks.[7]

12.  Numerous television programs and movies have prominently featured the Starbucks Marks, including Parks & Rec, The Voice, Ellen, Real Time, The Devil Wears Prada, Zoolander, License to Wed, The Proposal, Clueless, 127 Hours, and You've Got Mail.[8]

13.  The famous and highly distinctive nature of the Starbucks Marks is epitomized by the 2014 report by BrandZ, ranking Starbucks as the 31st Most Valuable Global Brand.[9]

14.  Starbucks polices and monitors all of its distribution channels to ensure strict compliance with Starbucks' intellectual property policies.[10]

15.  Starbucks Corporation's "foodservice channels" provide Starbucks beverages to consumers on airplane flights, in offices, at restaurants, and through university, college, hotel, hospital, and cruise line catering services.[11]

16.  Starbucks is highly selective in choosing what food service accounts it engages. It

---

[4]      Starbucks holds Copyright Reg. Nos. VA 875-932 and VA 1768-520 over the Siren Logos. (Jacobs Decl., ¶¶ 9, 13; Complaint, App. B.)

[5]      Dkt. No. 17 at 2-3; Dkt. No. 17-1, Warmke Decl., ¶¶ 2-9.

[6]      Dkt. No. 17 at 2-3, Dkt. No. 17-1, Warmke Decl., ¶¶ 4-9.

[7]      Dkt. No. 17 at 2-3, Dkt. No. 17-1, Warmke Decl., ¶ 8.

[8]      Dkt. No. 17 at 3; Dkt. No. 17-1, Warmke Decl., ¶ 9.

[9]      Dkt. No. 17 at 3; Dkt. No. 17-3, Diab Decl., ¶ 2, Ex. 1.

[10]     Dkt. No. 17 at 3; Dkt. No. 17-1, Warmke Decl., ¶ 7.

[11]     Dkt. No. 17 at 3-5; Dkt. No. 17-1, Warmke Decl., ¶ 11.

considers many qualitative factors, and dictates certain categories of locations that fall outside the boundaries of acceptable Starbucks locations due to the potential for an experience inconsistent with the high quality expected of the Starbucks brand.   These include convenience store locations.[12]

17.   Food service accounts may serve a number of products,; Starbucks provides THE accounts with various approved ingredients to use in these products.[13]   Starbucks also provides the accounts with storage, serving, cleaning, and preparation supplies and labels and marketing.[14]

18.   Quality control of food service accounts is of the highest concern to Starbucks.   The accounts are contractually required to use Starbucks-supplied recipes that set forth the ingredients, proportions, and process for making beverages.   To control the quality of beverages, Starbucks has set numerous coffee standards, specifically approves the types of machines that can be used to produce beverages, requires only authorized representatives or agents to calibrate machines, and specially approves machines for accounts to use to prepare their beverages.[15]

19.   Starbucks has not approved food service accounts to use machines that allow individuals to make their own espresso-based beverages.[16]

20.   To distinguish a food service account from a Starbucks store, Starbucks food service accounts use the "We Proudly Serve Starbucks®" slogan.   Starbucks closely tracks use of this slogan.   Food service accounts may only use the slogan as depicted and must use non-Starbucks branding as their principal branding, so that consumers understand that the account, not Starbucks, is preparing and serving the beverage.[17]

---

[12]      Dkt. No. 17 at 3-5, Dkt. No. 17-1, Warmke Decl., ¶¶ 12-14.
[13]      Dkt. No. 17 at 3-5, Dkt. No. 17-1, Warmke Decl., ¶ 15; Dkt. No. 17-3, Diab Decl., ¶ 3, Ex. 2.
[14]      Dkt. No. 17 at 3-5, Dkt. No. 17-1, Warmke Decl., ¶ 15; Dkt. No. 17-3, Diab Decl., ¶ 3, Ex. 2.
[15]      Dkt. No. 17 at 4-5; Dkt. No. 17-1, Warmke Decl., ¶¶ 16-18; Dkt. No. 17-3 Diab Decl., ¶¶ 3-8, Exs. 4-9.
[16]      Dkt. No. 17 at 4-5; Dkt. No. 17-1, Warmke Decl., ¶¶ 16-18; Dkt. No. 17-3 Diab Decl., ¶¶ 3-8, Exs. 4-9.
[17]      Dkt. No. 17 at 5; Dkt. No. 17-1, Warmke Decl., ¶¶ 22-27; Dkt. No. 17-3, Diab Decl., ¶¶ 6-8 Exs. 5-7.

21.   Starbucks has the right to cancel any food service account that fails to adhere to Starbucks brand guidelines.[18]

**C.    Uncontested Facts Regarding Defendants' Unlawful Use of the Starbucks Marks and Copyrights**

22.   Defendants market, advertise, sell, and offer to sell commercial coffee dispensing machines, most commonly known as the Trieste, under various company names through various websites and online advertisements and videos, all displaying the Starbucks Marks and Copyrights without authorization from Starbucks.[19]

23.   Starbucks has sent defendants numerous cease-and-desist letters since 2011 objecting to their infringing use of the Starbucks Marks.[20]  Heller, the founder of both Specialty Coffees and Café Nu, responded to the first cease-and-desist letter, but has ignored subsequent letters from Starbucks.[21]

24.   Despite repeated warnings from Starbucks not to use the Starbucks Marks, defendants have continued their infringing activities.  Infringing uses of the Starbucks Marks and Copyrights have been found in at least the following locations since 2012 and are believed to be accounts of or otherwise doing business with defendants, or distributors that are conducting infringing activities with the authorization of defendants:[22]

a.    Alfredo's Mexican Food's ("Alfredo's"), in El Monte, California; [23]

b.    The website Craigslist.com;[24]

---

[18]    Dkt. No. 17 at 5; Dkt. No. 17-1, Warmke Decl., ¶¶ 22-27; Dkt. No. 17-3, Diab Decl., ¶¶ 6-8 Exs. 5-7.
[19]    Dkt. No. 17  at 7-8; Dkt. No. 17-2, Jacobs Decl., ¶¶ 17-46; Dkt. No. 17-3, Diab Decl., ¶¶ 9, 15-22, Exs. 8, 14-21.
[20]    Dkt. No. 17 at 7-9; Dkt. No. 17-2, Jacobs Decl., ¶¶ 21-24, 30; Dkt. No. 17-3, Diab Decl., ¶¶ 9, 11-12, Exs. 8, 10-11.
[21]    Dkt. No. 17, at 7-8; Dkt. No. 17-2, Jacobs Decl., ¶ 21; Dkt. No. 17-3, Diab Decl., ¶ 10, Ex. 9.
[22]    See Dkt. No. 17-2, Jacobs Decl., ¶ 46; *See* Diab Decl., ¶¶ 19-22, Exs. 18-21.
[23]    See Dkt. No. 17-2, Jacobs Decl., ¶ 21; Dkt. No. 17-3, Diab Decl., ¶ 10, Exh. 9.
[24]    Dkt. No. 17  at 9; Dkt. No. 17-2, Jacobs Decl., ¶¶ 30, 40-41; Diab Decl., ¶ 15, Ex. 14.

      c.      The website Franchise.com;[25]

      d.      The website EasternMassWorks.com;[26]

      e.      Sherwood Shell, Baton Rouge, Louisiana;[27]

      f.      Morrow's Food Mart, Krotz Springs, Louisiana;[28]

      g.      Howie Glynn & Sons Convenience Store, Salem, New Hampshire;[29]

      h.      Mr. Express Fuel, Houston, Texas.[30]

      i.      Vlero gas station in Rocklin, California;[31]

      j.      Lake Shore Pearl Apartments, Austin, Texas;[32]

      k.      Burger Delight, Prairieville, Louisiana, via Alpha Marketing;[33]

      l.      Convenience stores in Kansas City, Missouri, via LaRue Coffee Roasterie.

25.  Starbucks has also discovered various of defendants' distributors, including John Jarrett of Louisiana; Ram Distributors in Oakland Gardens, New York; ACTA Distribution in Riverside, California; Java Texas; AZ Specialty Coffees; Brew Maters Plus; and Espresso Northwest that appear to be distributors for or otherwise doing business with defendants and are conducting infringing activities with defendants' authorization.[34]

26. Defendants distribute marketing materials and old Starbucks logo guidelines, and even provide written scripts to distributors and customers; in this way they display and encourage use of the Starbucks Marks.[35]

---

[25]    Dkt. No. 17 at 9; Dkt. No. 17-2, Jacobs Decl., ¶¶ 29-31; Diab Decl., ¶¶ 13, 18, Exs. 12, 17.

[26]    Dkt. No. 17 at 9; Dkt. No. 17-2, Jacobs Decl., ¶¶ 29-31; Diab Decl., ¶¶ 13, 18, Exs. 12, 17.

[27]    See Dkt. No. 17-3, Diab Decl., ¶ 14, Ex. 13.

[28]    Declaration of Tony Diab ("Diab Decl. II"), ¶ 6, Ex. 4.

[29]    Diab Decl. II, ¶ 6, Ex. 4.

[30]    Diab Decl. II, ¶ 7, Ex. 5.

[31]    Diab Decl. II, ¶ 10, Ex. 8.

[32]    Diab Decl. II, ¶ 11, Ex. 9.

[33]    Diab Decl. II, ¶ 5, Ex. 3.

[34]    See Dkt. No. 17 at 9-11; Dkt. No. 17-2, Jacobs Decl., ¶¶ 29-31, 35; Dkt. No. 17-3, Diab Decl., ¶¶ 13, 19-22, Exs.12, 18-21; Diab Decl. II, ¶¶ 3, 4, 9, Exs. 1, 2, 7.

[35]    Dkt. No. 17 at 11; Dkt. No. 17-2, Jacobs Decl., ¶ 46; Dkt. No. 17-3, Diab Decl., ¶¶ 19-22, Exs. 18-21.

27.   Defendants instruct their distributors, customers, and accounts to ignore cease-and-desist letters from Starbucks, and falsely provide assurances that their use of the Starbucks Marks was and is lawful.[36]

28.   Defendants continue to misrepresent to potential customers via YouTube and Vimeo that they have authority to use the Starbucks Marks in selling the Trieste and other similar commercial coffee makers.[37]

29.   Defendants are not, and never have been, authorized licensees of Starbucks.

30.   Defendants have never sought or received permission from Starbucks to use any of Starbucks Corporation's protected intellectual property, including but not limited to the Starbucks Marks or Copyrights.

31.   Defendants have made no noticeable efforts to discontinue their unlawful activities after receiving cease-and-desist letters from Starbucks.

32.   Heller, Specialty Coffees, Café Nu, and other presently unknown companies controlled by Heller, have continued to misrepresent to customers that defendants have the authority to use the Starbucks Marks in the sale of the Trieste.

33.   Defendants do not dispute that they are intentionally and without authorization from Starbucks, using the Starbucks Marks and Copyrights to market, advertise, sell, and offer to sell commercial coffee dispensing machines and related coffee products.

**D.**   **Irreparable Harm**

34.   Defendants' unlawful use of the Starbucks Marks and Copyrights tarnishes the Starbucks brand because they sell product in settings where Starbucks prohibits sales.[38]

35.   Defendants' unlawful use of the Starbucks Marks and Copyrights risks a negative connotation among Starbucks consumers who purchase counterfeit product or observe counterfeit product being sold in settings typically prohibited by Starbucks.[39]

---

[36]   See Dkt. No. 17-3, Diab. Decl., ¶ 16, Ex. 15.
[37]   See, e.g., Dkt. No. 17-3, Diab Decl., ¶ 18, Ex. 17.
[38]   Dkt. No. 17 at 22; Dkt. No. 17-1, Warmke Decl.; Dkt. No. 17-3, Diab Decl., ¶ 21, Ex. 20.
[39]   Dkt. No. 17 at 22; Dkt. No. 17-1, Warmke Decl., ¶ 4; Diab Decl., ¶ 22, Ex. 21.

36. Defendants' unlawful use of the Starbucks Marks and Copyrights deprives Starbucks of potential authorized accounts, particularly in its food service channels.[40]

37. Defendants' unlawful use of the Starbucks Marks and Copyrights sours potential authorized accounts and dissuades them from working with Starbucks because of the perceived association with defendants and their poor experiences of doing business with defendants.[41]

38. Defendants' unlawful use of the Starbucks Marks and Copyrights deprives Starbucks of the ability to exercise quality control, which Starbucks expends substantial resources to enforce.[42]

39. Defendants' unlawful use of the Starbucks Marks and Copyrights alienates Starbucks Corporation's current food service accounts who observe counterfeit product being sold without having to meet Starbucks Corporation's high quality control standards.[43]

40. Defendants' unlawful use of the Starbucks Marks and Copyrights impedes Starbucks Corporation's food service accounts from growing their business, which sell product that competes with defendants.[44]

41. Loss of control, loss of goodwill, and damage to Starbucks Corporation's reputation cannot be quantified. Money damages are insufficient to compensate Starbucks for Defendants' unlawful misconduct.

42. One customer misled by defendants stated: "We were misle[d] when we bought this machine. . . . [We] ha[ve] a substantial amount of money tied up in [this transaction with defendants], . . . [and] paid for the Starbucks name. . . . [We] can buy a latte machine anywhere else for a lot less."[45]

43. Starbucks has engaged in extensive efforts to stop defendants' infringement informally without filing legal action. Defendants, however, reemerge under a new name, selling a new

---

[40]      Dkt. No. 17 at 22; Dkt. No. 17-1, Warmke Decl., ¶¶ 11-21.
[41]      Dkt. No. 17 at 22; Dkt. No. 17-2, Jacobs Decl., ¶ 44.
[42]      Dkt. No. 17 at 22; Dkt. No. 17-1, Warmke Decl., 16-27; Dkt. No. 17-3, Diab Decl. ¶¶ 3-8, Exs. 2-7.
[43]      Dkt. No. 17 at 22; Dkt. No. 17-3, Diab Decl., ¶¶ 3-8, Exs. 2-7.
[44]      Dkt. No. 17 at 22; Dkt. No. 17-1, Warmke Decl., ¶¶ 11-15.
[45]      Dkt. No. 17 at 23; Dkt. No. 17-3, Diab Decl., ¶ 14, Ex. 13.

1    product, to continue their infringing misconduct.[46]

2    44.  Consumer complaints have caused and continue to cause a diminution in value of the

3    Starbucks Marks.

4    45.  Starbucks Corporation's products are placed at a competitive disadvantage when they

5    compete against counterfeit products bearing the Starbucks Marks.

6    46.  Defendants have presented no evidence or argument to rebut Starbucks Corporation's

7    evidence of irreparable harm.

8    **E.    Balance of the Harms**

9    47.  The only potential hardship defendants will suffer if an injunction is granted is that

10   they will be required to forfeit the ill-gotten profits they have received from selling commercial

11   coffee dispensing machines improperly bearing the Starbucks Marks and Copyrights.

12   48.  Without a preliminary injunction, Starbucks will suffer continued, significant, and

13   lasting harm.

14   **F.    Public Interest**

15   49.  Defendants use exact duplicates of the Starbucks Marks and Copyrights intentionally

16   to mislead customers to purchase counterfeit product.

17   50.  Defendants mislead customers by falsely assuring them that defendants are authorized

18   to sell their product by Starbucks, even after Starbucks has specifically informed defendants that

19   they are not so authorized.

20   51.  Defendants have been identified on Ripoffreport.com several times as engaging in

21   misleading conduct.[47]

22   52.  The public interest is served in protecting the holders of valid trademarks and

23   copyrights from infringers.

24

---

25   [46]    Dkt. No. 17 at 23; Dkt. No. 17-3, Diab Decl., ¶ 23, Ex. 22 (Mr. Heller admits this in
     response to customers' complaints about his products on Ripoffreport.com, saying: "[The
26   customer complaint] states that I have had a number of company names over the 17 years.  True.
     I went from a single proprietorship to a partnership to a corporation and the names changed each
27   time").

28   [47]    Dkt. No. 17-3, Diab Decl., ¶ 22, Ex. 21.

53.   The public interest is served by upholding Starbucks Corporation's exclusive right to reproduce, distribute, and license the authorized use of the Starbucks Marks and Copyrights.

54.   The public interest is served by protecting consumers from products sold under the Starbucks Marks without authorization and without proper quality control.

55.   Enjoining defendants from using the Starbucks Marks and Copyrights would remove this confusion.

## CONCLUSIONS OF LAW

1.   To determine whether to issue a preliminary injunction, the court must balance four factors, including whether (1) plaintiff is likely to succeed on the merits; (2) plaintiff will suffer irreparable harm in the absence of preliminary relief; (3) the equities favor plaintiff; and (4) the preliminary injunction is in the public interest. *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1021 (9th Cir. 2009); see *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7 (2008).

2.   The Ninth Circuit employs a "sliding scale" under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing of another.  For example, a stronger showing of irreparable harm to plaintiff might offset a lesser showing of likelihood of success on the merits." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (holding that the sliding scale approach survives *Winter* so long as there is a showing of likely irreparable harm).

A.   <u>Likelihood of Success on the Merits</u>

1.   <u>Trademark Infringement and Unfair Competition</u>

3.   To succeed on its trademark infringement claim, Starbucks must prove that it has a protectable interest in the Starbucks Marks and that defendants' use of them is likely to cause consumer confusion. *Warner Bros. Ent't v. The Global Asylum, Inc.*, CV 12-9547 PSG (CWx), 2012 WL 6951315, *3 (C.D. Cal. Dec. 10, 2012) (quoting *Dept. of Parks & Recreation v. Bazaar Del Mundo Inc.*, 448 F.3d 1118, 1124 (9th Cir. 2006)).

4.   For an unfair competition claim under the Lanham Act, a plaintiff must establish that

1 a defendant is using a mark confusingly similar to a vlaid, protectable trademark of a plaintiff.

2 *AMF, Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979).

3    5.   A federally-registered trademark is one of many ways to demonstrate a protectable

4 interest.  *Applied Info. Scis. Corp. v. eBay, Inc.*, 511 F.3d 966, 970 (9th Cir. 2007).

5    6. An incontestable registration conclusively evidences "the validity of the registered mark

6 and of the registration of the mark, of the registrant's ownership of the mark, and of the

7 registrant's exclusive right to use the registered mark in commerce."  15 U.S.C. § 1115(b).

8    7.   The Starbucks Marks are federally registered on the Principal Register at the U.S.

9 Patent and Trademark Office.

10    8.   "Likelihood of confusion exists when consumers viewing the mark would probably

11 assume that the goods it represents are associated with the source of a different product identified

12 by a similar mark."  *KP Permanent Make-Up, Inc. v. Lasting Impression 1, Inc.*, 408 F.3d 596,

13 608 (9th Cir. 2005).

14    9.   The Ninth Circuit employs an eight factor test to determine whether a likelihood of

15 confusion exists: (1) the strength of the mark; (2) the proximity or relatedness of the goods; (3) the

16 similarity of the marks; (4) evidence of actual confusion; (5) the marketing channels used; (6) the

17 degree of care customers are likely to exercise in purchasing the goods; (7) the defendant's intent

18 in selecting the mark; and (8) the likelihood of expansion into other markets.  *Sleekcraft Boats*,

19 599 F.2d at 348-49 ; see *GoTo.com, Inc. v. Walt Disney Co.*, 202 F.3d 1199, 1205 (9th Cir.

20 2000).

21    10.  With respect to the first factor, the Starbucks Marks are famous and highly distinctive.

22    11.  With respect to the second factor, both Starbucks and defendants sell coffee products.

23 It is a virtual certainty that the public will be mistaken by defendants' use of the Marks.

24 Defendants intentionally provide outdated Starbucks guidelines, falsely tell their customers that

25 they are licensed by Starbucks, and encourage their customers to ignore cease-and-desist letters

26 from Starbucks to lend credibility to their illegitimate business.

27    12.  With respect to the third factor, defendants use marks identical to the Starbucks Marks

28

in their marketing and on their commercial coffee dispensing machines.

13.   With respect to the fourth factor, purchasers of defendants' commercial coffee dispensing machines have been confused as to the source of the goods, and have believed that defendants had authorization from Starbucks to sell the machines.

14.   With respect to the fifth factor, both Starbucks, through its food service channels, and defendants utilize the same marketing channels to market coffee and coffee beverages to small businesses that sell to the general public.

15.   With respect to the sixth factor, defendants sell commercial coffee dispensing machines that purport to brew Starbucks brand coffee beverages.   Defendants appear to cater to unsophisticated small businesses.  Defendants falsely tell these businesses that they are Starbucks Corporation's authorized licensees.  These customers do not exercise a high level of sophistication in making their purchases.

16.   With respect to the seventh factor, it appears that defendants intentionally adopted the Starbucks Marks to trade on Starbucks Corporation's goodwill and strong reputation.  Despite Starbucks Corporation's attempts to prevent defendants from unlawfully using the Starbucks Marks, defendants' misconduct continues unabated and has accelerated.   Defendants give their customers obsolete copies of Starbucks logo guidelines to suggest their association with Starbucks.

17.   With respect to the eighth factor, since plaintiff filed this action, it has discovered multiple additional infringing locations associated with defendants from California to New Hampshire.  The scope of the infringement appears to be large and growing.

18.   All of these factors favor a finding of likelihood of confusion.

## 2.   Trademark Dilution

19.   "A plaintiff seeking relief under federal anti-dilution laws must show that its mark is: (1) famous and distinctive; (2) that defendant began using its mark in commerce after plaintiff's mark became famous and distinctive, and (3) that defendant's mark is likely to dilute plaintiff's mark.  *Perfumebay.com Inc. v. eBay, Inc.*, 506 F.3d 1165, 1179-80 (9th Cir. 2007).

20.   Dilution by blurring is association arising from similarity between a mark or trade

name and a famous mark that impairs the distinctiveness of the famous mark.  In determining whether a mark or trade name is likely to cause dilution by blurring, the court may consider all relevant factors, including the following: "(1) the degree of similarity between the mark . . . and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark . . . intended to create an association with the famous mark; (6) any actual association between the mark . . . and the famous mark."  15 U.S.C. § 1125(c)(2)(B).

21.  A mark is considered "famous" if it "is widely recognized by the general consuming public of the U.S. as a designation of source of the goods or services."  15 U.S.C. § 1125 (c)(2)(A).

22.  A court in the Ninth Circuit previously found the Starbucks Marks to be famous. *Starbucks Corp. v. Lundberg*, Civil No. 02-948-HA, 2005 WL 3183858, *3 (D. Or. Nov. 29, 2005).  The number of Starbucks' stores, its sales figures, advertising and marketing efforts, and media coverage all speak to the fame of the Starbucks Marks.

23.  The Starbucks Marks and the marks defendants use are identical.

24.  Starbucks has made significant efforts to police and protect its marks.  It sets strict standards and quality controls for its Authorized Resellers.  While Starbucks licenses its name, it does so only where it can be certain the licensee's products and services meet exceptional internal standards.

25.  Defendants use marks identical to the Starbucks Marks.  The Starbucks Marks are known worldwide, rivaling the most well-known marks in the U.S.

26.  The Starbucks Marks are famous and highly distinctive.  Defendants began using the Starbucks Marks in commerce well after the Starbucks Marks became famous and highly distinctive.

27.  With respect to the sixth factor, actual dilution exists. For instance, Charlie Investments in Louisiana specifically reported complaints and decreased coffee sales as a reult of

13

1  the Trieste.[48] The presence of the Starbucks Marks in convenience stores also evidences dilution,

2  because Starbucks prohibits authorized resellers from selling in such venues.

3  **3.    Copyright Infringement**

4  28.  To prove copyright infringement, Starbucks must show "ownership of the allegedly

5  infringed material and . . . demonstrate that the alleged infringers violate at least one exclusive

6  right granted to copyright holders under 17 U.S.C. § 106.  17 U.S.C. § 106; *A&M Records, Inc.*

7  *v. Napster, Inc.*, 239 F.3d 1004, 1013 (9th Cir. 2007).

8  29.  A certificate of registration is "prima facie evidence of the validity of the copyright

9  and the facts stated in the certificate."  17 U.S.C. § 410(c).

10  30.  Starbucks owns valid copyrights in the Siren Logos.

11  31.  The Siren Logos are widely disseminated by Starbucks.

12  32.  Defendants intentionally use identical logos to promote and sell their commercial

13  coffee dispensing machines.

14  33.  Defendants use the Siren Logos in videos, engraved them on their products, and

15  display them on their  web pages.

16  **B.    Irreparable Harm**

17  34.  A plaintiff moving for a preliminary injunction must demonstrate not only that harm

18  is irreparable, but also imminent.  *Caribbean Marine Servs. Co., Inc. v. Baldridge*, 844 F.2d 668,

19  674 (9th Cir. 1988); see also *A&M Records, Inc.*, 239 F.3d at 1013.

20  35.  Following issuance of the Supreme Court's decision in *eBay Inc. v. MercExchange,*

21  *L.L.C.*, 547 U.S. 388, 391 (2006), a court may no longer presume irreparable injury from the

22  bare fact of liability in a copyright or trademark case.  Nonetheless, the injury caused by the

23  presence of infringing products in the market – such as lost profits and customers, as well as

24  damage to goodwill and business reputation – will often constitute irreparable injury. See, e.g.,

25  *Microsoft Corp. v. Atek 3000 Computer Inc.*, No. 06 CV 6403(SLT)(SMG), 2008 WL 2884761,

26  *5 (E.D.N.Y. July 23, 2008) (concluding that plaintiff had shown irreparable injury where it had

27

28  [48]     Dkt. No. 17 at 9-10; Dkt. No. 17-2, Jacobs Decl., ¶¶ 37-39.

14

1  "established that defendant committed copyright and trademark infringement, and . . . there [was]

2  no reason to conclude that defendant ha[d] or [would] cease its infringing acts because it continued

3  infringing plaintiff's copyrights and trademarks despite being notified of its infringement"). See

4  also *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush and Co., Inc.*, 240 F.3d 832, 841 (9th Cir.

5  2001) ("Evidence of threatened loss of prospective customers or goodwill certainly supports a

6  finding of the possibility of irreparable harm"); *Kalologie Franchising LLC v. Kalologie Skincare*

7  *Med'l Group of California*, Case No. CV 14-00016 DDP, 2014 WL 953442, at *5 (C.D. Cal.

8  Mar. 11, 2014) ("A plaintiff's loss of control over its business reputation resulting from a

9  defendant's alleged unauthorized use of its protected mark during the pendency of an infringement

10  action can constitute irreparable harm justifying injunctive relief"). Such harms are difficult to

11  quantify and compensate over time. See *Herb Reed Enter., LLC v. Florida Entm't Mgmt., Inc.*,

12  736 F.3d 1239, 1250 (9th Cir. 2013). Starbucks has amply demonstrated that it has suffered and

13  will continue to suffer these types of harm.

14      36. Starbucks has demonstrated, and defendants have failed to rebut, that Starbucks is

15  being irreparably harmed because, by selling product in locations where Starbucks prohibits sales;

16  selling counterfeit product that does not perform as well as genuine Starbucks product; depriving

17  Starbucks of potential authorized accounts, particularly in its food service channels; discouraging

18  potential authorized accounts from working with Starbucks because of a perceived association with

19  the poor experience of doing business with defendants; depriving Starbucks of its ability to

20  exercise quality control; alienating current Starbucks food service accounts that observe counterfeit

21  product being sold without being held to Starbucks' high quality control standards; and impeding

22  Starbucks food service accounts from growing their business, defendants' actions tarnish the

23  Starbucks brand.

24      37. Absent preliminary injunctive relief, Starbucks will continue to be irreparably harmed

25  by defendants during the pendency of this litigation.

26      **C.**    **Public Interest**

27      38. "Enjoining violation of federal statutes is in the public interest." *Am. Trucking*

28

*Assocs., Inc. v. City of Los Angeles*, 559 F.3d 1046, 1060 (9th Cir. 2009).  "[T]he most basic public interest is the public's right not to be deceived or confused."  *Warner Bros. Ent't*, 2012 WL 6951315 at *23; see *Internet Specialties W., Inc. v. Milon-DiGiorgia Enter., Inc.*, 559 F.3d 985, 991 (9th Cir. 2009).

39.  In trademark cases, "the most basic public interest at stake . . . [is] the interest in prevention of confusion, particularly as it affects the public interest in truth and accuracy."  *Warner Bros. Ent't*, 2012 WL 6951315 at *23.  (quotation omitted).  When there is a likelihood of consumer confusion due to the use of confusingly similar marks "it follows that if such use continues the public interest would be damaged."  *Id.*

40.  Here, defendants are using marks identical to Starbucks.  They are misleading their customers by holding themselves out as authorized resellers of Starbucks after having been told specifically that they were not authorized to do so.  Defendants are encouraging the sale of unauthorized products using the Starbucks Marks and Copyrights, which confuses consumers about the source and quality of goods associated with Starbucks.  They have, moreover, have expanded their efforts to deceive the public by marketing to distributors across the country.  Defendants have been identified on Ripoffreport.com more than once, with customers who had been deceived warning others not to be similarly deceived.  The posts on Ripoffreport.com acknowledge that customers were drawn to defendants' advertisements because of their purported affiliation with Starbucks.  The public interest, therefore, favors entry of an injunction.

**D.**     **Balance of Equities**

41.  Courts must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Amoco Prod. Co. v. Vill. Of Gambell, Alaska*, 480 U.S. 531, 542 (1987); *Cybermedia, Inc. v. Symantec Corp.*, 19 F.Supp.2d 1070, 1073 (N.D. Cal. 1998) (copyright infringement); see also *Cadence Design Sys., Inc. v. Avant! Corp.*, 125 F.3d 824, 826 (9th Cir. 1997) (citing *Sega Enterprises Ltd. v. Accolade, Inc.*, 977 F.2d 1510, 1517 (9th Cir. 1992)).

42.  Starbucks has been using its Marks and Copyrights for decades.  Defendants

1    intentionally infringe the Starbucks Marks and Copyrights to profit from Starbucks' reputation and

2    goodwill.  The only harm defendants will suffer if an injunction is entered is that they will be

3    unable to continue to profit from infringing the Starbucks Marks and Copyrights.  Courts routinely

4    disregard this type of "hardship."  Cadence Design Sys., Inc., 125 F.3d at 830.

5         43.  Starbucks' requested relief is narrowly tailored.  It seeks only to have defendants cease

6    using the Starbucks Marks and Copyrights in marketing and selling of their product.  The

7    requested injunction protects the Starbucks Marks and Copyrights while at the same time allowing

8    defendants to sell legitimate products that do not utilize Starbucks' valuable intellectual property.

9

10                                    **CONCLUSION**

11        For the reasons stated, Starbucks has carried its burden of establishing that it will likely

12   prevail on the merits of its trademark infringement, unfair competition, trademark dilution, and

13   copyright infringement claims.  Starbucks has also demonstrated that it will lilkely suffer

14   irreparable harm if an injunction does not issue.  Finally, the balance of harms and the public

15   interest favor entry of a preliminary injunction.

16

17   DATED:  November 26, 2014

                                       _____
18                                     MARGARET M. MORROW
                                       UNITED STATES DISTRICT JUDGE
19

20

21

22

23

24

25

26

27

28

                                            17